UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| CRAIG CUNNINGHAM, §<br>§<br>§ Case No. 4:19-cv-896-ALM-CAN<br>Plaintiff §<br>§<br>v. § Hon. Christine A. Nowak<br>§<br>MATRIX FINANCIAL SERVICES, LLC, §<br>NATIONAL CAR CURE, LLC, ZANDER §<br>COLLINS & SMITH, DAVID §<br>GLENWINKEL, SING FOR SERVICE, LLC §<br>D/B/A MEPCO, §<br>§<br>Defendants. § | |

**DEFENDANT SING FOR SERVICE, LLC D/B/A MEPCO'S REPLY BRIEF IN
SUPPORT OF MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**

SING for Service, LLC d/b/a Mepco ("MEPCO"), files its Reply in support of MEPCO'S 12(b)6 Motion to Dismiss [DE 82] to Plaintiff Craig Cunningham's (Plaintiff) Response in Opposition to Motions to Dismiss filed by all Defendants [DE 94] regarding Plaintiff's Amended Complaint [DE 50].

**ARGUMENT**

Plaintiff concedes that SING for Service, LLC d/b/a Mepco ("MEPCO') never made any of the alleged phone calls referenced in Plaintiff's Amended Complaint.  As such, Plaintiff's claims against MEPCO must be dismissed unless Plaintiff's Amended Complaint pleads specific facts that show another party acted as MEPCO's agent in making the calls at issue, such that Mepco could be found liable under a vicarious liability theory.  Plaintiff's Amended Complaint fails to allege the required facts, as demonstrated by the only two paragraphs that reference MEPCO's conduct: paragraphs 51 and 52, necessary to assert a vicarious liability claim against MEPCO.

In paragraph 51, Plaintiff alleges that MEPCO ratified the alleged telemarketing calls because, despite having notice of the allegations in Plaintiff's Original Complaint, Mepco "did not sever business ties with these companies and continued to ratify the conduct by continuing to accept customers generated from Defendants Matrix and Defendant National Car Cure."  (DE 50 p.11).  Plaintiff's allegations in paragraph 51are insufficient and fail to establish the facts necessary to assert a ratification claim against MEPCO.

Ratification can occur when a principal retains the benefits of a transaction after he acquires full knowledge of the agent's unauthorized act.  *Schakosky v. Client Servs.*, 634 F. Supp. 2d 732, 735-736 (E.D. Tex. 2007) (citing *Miller v. Kennedy & Minshew, P.C.*, 142 S.W.3d 325, 342 (Tex. App.—Fort Worth 2003, no pet.)).  Of critical importance is the principal's knowledge of the transaction and his actions in light of such knowledge. Id. at 736.  Here, Plaintiff has not plead facts alleging or establishing that MEPCO benefited from any particular wrongful or unauthorized act.  More significantly, Plaintiff's allegations, even taken as true, fail to satisfy the requirement that MEPCO had full knowledge of any wrongful act.  The other Defendants have denied committing any wrongful acts as to Plaintiff and Plaintiff has not allege facts that establish MEPCO knowledge of Defendants wrongful acts.

Plaintiff's allegations, denied in their entirety by the counterparties, fall far short of satisfying the exacting standard for establishing ratification.  Plaintiff has failed to direct the Court to any legal authority supporting his theory that MEPCO was required to sever all business ties before the allegations have been fully adjudicated on the merits by a court.  Plaintiff's "***because I say so***" approach ignores each Defendant's right to defend claims asserted in a pleading and seek due process by having their claims resolved by a neutral finder of fact in Federal court.

In paragraph 52, Plaintiff alleges that MEPCO was given actual authority over Defendants Matrix and National Car Cure because MEPCO contracted with those Defendants "to generate customers for [MEPCO] through illegal telemarketing." (Doc. 50; Page ID # 254). Plaintiff's Amended Complaint does not identify the specific contracts or attach the alleged contracts. If MEPCO had contracted with Defendants to perform illegal telemarketing, or even telemarketing, Plaintiff might have a point. However, no such contract has been identified by Plaintiff.

The actual contracts that govern MEPCO's relationship with the Defendants establish that MEPCO serves the role of a payment processor, collecting payments and managing the payment process for the purchasers of Defendants' Service Contracts. See, MEPCO's Contracts with Defendant National Car Cure, attached as **Exhibit A**, and Defendant Matrix, attached as **Exhibit B**. There is zero reference to any telemarketing requirements in the contracts, and the only general reference to Defendants' sale of Service Contracts are contained in the Defendants' representations and warranties to MEPCO whereby Defendants' agree that all sales will comply with all applicable laws. See Ex. A at § 9; Ex. B at § 4.

Plaintiff's conclusions regarding MEPCO agreements with Defendants National Car Cure and Matrix are not based on any specific facts or evidence. Plaintiff has the burden to plead facts that support his claims against MEPCO. If Plaintiff contends a contract exists that requires Defendants to engage in telemarketing – or illegal telemarketing – on behalf of MEPCO, Plaintiff is obligated to identify the agreement or attach a copy of the agreement to Plaintiff's Amended Complaint. Plaintiff did neither. Although, Plaintiff asks the Court for another opportunity to amend his pleading, Plaintiff's pleading failure cannot be cured because MEPCO has no telemarketing agreement with any defendant and no facts exist to allege that MEPCO asserted control over the other codefendants .

Cunningham's Amended Complaint fails to allege sufficient facts against MEPCO to state a plausible claim for relief based on a vicarious liability theory. Plaintiff's Amended Complaint, is also not saved from dismissal because of the generic, "threadbare" legal conclusions asserted against all "Defendants" without distinction.  Since Cunningham's Amended Complaint against MEPCO fails to satisfy the pleading requirements of Rule 8(a) of the Federal Rules of Civil Procedure,  Plaintiff's claims against MEPCO should be dismissed with prejudice.

**FOR THESE REASONS**, in addition to the reasons contained in its Motion to Dismiss, Defendant SING for Service, LLC d/b/a MEPCO respectfully requests that this Court grant MEPCO's Motion to dismiss Plaintiff's Amended Complaint with prejudice.

DATED:  July 28, 2020

Respectfully submitted,

*/s/ William E. Reid*

_____

William E. Reid
State Bar No. 16748500
*wreid@reiddennis.com*

**REID & DENNIS, P.C.**
2600 Dallas Parkway, Suite 380
Frisco, Texas 75034
Telephone: (972) 991-2626
Facsimile: (972) 991-2678

Brion B. Doyle, pro hac vice
bdoyle@varnumlaw.com
**VARNUM LLP**
333 Bridge Street NW
Grand Rapids, Michigan  49504
Telephone: (616) 336-6479
Facsimile:  (616) 336-7000

**COUNSEL FOR DEFENDANT
SING FOR SERVICE, LLC D/B/A
MEPCO**

4

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of the foregoing instrument was filed with the Court and forwarded to the following parties in accordance with the Federal Rules of Civil Procedure on the 28th day of July 2020, via electronic transmission, CM/ECF and via email.

Craig Cunningham
***Pro se* Plaintiff**
3000 Custer Road, Suite 270-206
Plano, TX 75075
craig.cunningham1980@gmail.com and
projectpalehorse@hushmail.com

R. Douglas Scott
**Attorney for Defendant David Glenwinkle**
3901 Arlington Highlands Blvd., Suite 200
Arlington, TX 76018
DScott@craigzlaw.com

Andrew R. Kasner
McDowell Hetherington LLP
**Attorney for Defendant Matrix Financial Services**
1001 Fannin Street, Suite 2700
Houston, TX 77002
Andrew.kasner@mhllp.com

*/s/ William E. Reid*
_____
William E. Reid

# EXHIBIT A

# SING FOR SERVICE, LLC
# DEALER AGREEMENT

This DEALER AGREEMENT (the "Agreement") is made and entered into on _3-22-19_ , by and between SING For Service, LLC, a Delaware Limited Liability Company ("SING") and _National Car Care_ / 2owner Cutlass Smith a _Illinois_ ("Dealer").

SING is in the business of servicing payment plan programs and providing funding for companies that market, sell, administer, and otherwise provide vehicle service contracts and similar products, including (without limitation) mechanical breakdown insurance policies (collectively, "Service Contracts"), to consumers.

SING and Dealer agree as follows :

1. <u>Definitions.</u> When used in this Agreement, the following terms shall have the following meanings:

(a) "Administrator" means any person or entity that either administers a Service Contract marketed or sold by Dealer or is the obligor or any such Service Contract.

(b) "Payment Plan Agreement" means an instrument or document pursuant to which the Purchaser of a Service Contract agrees (subject to the terms and conditions of such Payment Plan Agreement) to make payments on a periodic basis toward the purchase price of such Service Contract.

(c) "Payment Plan Program" means the arrangement by which Dealer and/or Administrator submit Payment Plan Agreements to SING for funding, collection and processing by SING.

(d) "Purchaser" means any person who has purchased a Service Contract.

2. <u>Duties of Dealer</u>

(a) Dealer shall offer Service Contracts with an installment payment plan (the "Payment Plan Agreements") to purchasers ("Purchasers") only on forms (including electronic forms) which have been provided by SING for use in the Payment Plan Program and have verbal authorization which is recorded using recap scripts compliant with Vehicle Protection Association (VPA).

(b) Dealer shall abide by all policies, procedures, and requirements of SING with respect to any aspect of the Payment Plan Program as provided or communicated to Dealer by SING or Administrator from time to time, verbally or in writing. Dealer acknowledges that all of such policies, procedures, and requirements are for the sole benefit and protection of SING. SING shall receive for its services the applicable fee for the Payment Plan Program, as determined by SING from time to time (the "Discount Amount"). The amount of the Discount Amount and other operating procedures with respect to the Payment Plan Program may be amended from time to time by SING, upon at least 30 days' prior written notice to Dealer and shall apply to any contract submitted by Dealer to SING after the date of such notice. The Discount Amount, as initially established under this Agreement, and the related earn out schedule is set forth on Exhibit A which is hereby incorporated by reference.

(c) Upon execution of a Payment Plan Agreement, Dealer shall obtain and retain from the purchaser a minimum down payment of the purchase price for such Payment Plan Agreement as required by the Payment Plan Program, as determined by SING, in its sole and absolute discretion, from time to time. The purchase price, less the down payment, and thus the amount of the Payment Plan Agreement must be greater than or equal to the sum of all amounts paid to the Administrator in connection with such Payment Plan Agreement and the Discount Amount. In the event a Payment Plan Agreement is submitted that does not satisfy the qualification in the preceding sentence, SING may deduct from Dealer's regular, periodic funding the amount necessary in order to qualify such Payment Plan Agreement for funding. Such amount may be referred to by SING as a "shortage".

(d) All Payment Plan Agreements and supporting documentation shall be submitted by Dealer to SING, either directly by Dealer or through a fulfillment company.

1

(e)    Dealer bears the responsibility of providing the proper Purchaser's authorization for the administration of any ACH program: SING shall provide operational assistance for such program. All electronic data files must be delivered to SING in conformity with this Agreement.

3. SING's Right to Reject.

(a)   SING shall have the right, in its sole discretion and without liability to Dealer, to reject any Payment Plan Agreement for processing and funding.

(b)   Notwithstanding (a) above, SING will generally approve or reject a Payment Plan Agreement within 10 days and provide Dealer with a letter and email if the Payment Plan Agreement is rejected. Accepted Payment Plan Agreements are noted in daily or weekly Dealer reports.

4. Funding to Dealer and/or Administrator. Dealer acknowledges that SING will provide funding related to the Payment Plan Agreements. SING will typically provide funding to Dealer's Administrator(s), such funding herein characterized as Dealer Cost;   and to Dealer, such funding herein characterized as Dealer Profit. The funding metrics to Dealer will be as set forth on Exhibit B, which is hereby, incorporated by reference. On or about the Friday of the week following the week in which a Purchaser has made the first installment due under such Purchaser's Payment Plan Agreement, or at such other time and interval as SING and Dealer may agree, SING will submit funding to Dealer in the form of a check payable to Dealer, or, at SING's option, by wire transfer for the benefit of Dealer. The amount to be funded to Dealer will be adjusted for the Discount Amount, any amounts due SING by Dealer for the Refund Amount, or other obligations of Dealer, and other amounts retained by SING as more specifically set forth on Exhibit B.

5.    Holdbacks from Funding.    SING will withhold or retain from dealer's periodic, regular funding, such amount or amounts as set forth in the attached Exhibit B. SING may refer to such amounts as "reserves", "holdbacks", or such other term

generally describing the purpose for which these holdbacks are established, maintained and/or controlled by SING. Such holdbacks or reserves may be used by SING, at such time and in such amounts as SING in its sole and absolute discretion elects to apply any or all such withheld sums to the Refund Amount defined below. In some instances, SING and Dealer may agree to a holdback and funding arrangement whereby the amount of the holdback, is established as a set amount per Payment Plan Agreement, or a Percentage of the Dealer Profit attributable to a Payment Plan Agreement or such other amount or formula as may be agreed upon and set forth on Exhibit B. SING and Dealer may agree on a funding arrangement whereby the Refund Amount owed by Dealer will be set off against the holdback or reserves; or alternatively the Refund Amount is to be set off against amounts due Dealer for the funding period following the calculation of the Refund Amount. The funding structure and adjustments to funding for the Refund Amount or other amounts due SING by Dealer will be as set forth in the attached Exhibit B. Dealer acknowledges and agrees that SING may provide any or all of Dealer's Administrators such holdback or reserve information.

6. Payment to Administrator.  Upon receipt of evidence of a Purchaser's authorization of a Payment Plan Agreement in accordance with paragraph 2(a) and paragraph 4, SING shall pay Administrator as determined by SING.

7. Cancellation.  SING has the right to terminate a Payment Plan Agreement at any time and from time to time.   In the event that a Payment Plan Agreement is canceled for any reason, Dealer shall be obligated to refund SING the following amount: (1) the amount funded by SING; plus (2) any late payment charges due to SING; less (3) payments SING received from the Purchaser; less (4) any amounts received by SING from Administrator with respect to the canceled Payment Plan Agreement (the "Refund Amount"). It is expressly understood and agreed that the intent of this Section 7, including, but not by way of limitation, the calculations contained herein, is to provide a mechanism by which SING is to be made whole for amounts funded to both Dealer and Administrator.

2

SING may offset any unpaid Refund Amount from any amounts due to Dealer by SING.   SING's periodic funding report to Dealer shall set forth the offsets.   In the event SING, in its sole discretion, deems itself insecure, SING shall have the right to retain any funds due Dealer until SING deems itself secure.   As security for the payment of refunds to SING, Dealer hereby assigns and conveys to SING the right to receive any and all payments due from Administrator to Dealer with respect to all Payment Plan Agreements sold by Dealer which are administered by Administrator.   In the event that SING does not receive the Refund Amount within 90 days following the date any Payment Plan Agreement is canceled, Dealer hereby authorizes Administrator, upon notice from SING, to remit such amount directly to SING out of any funds due Dealer from Administrator. For each Payment Plan Agreement which is cancelled, SING will provide Dealer with the billed Refund Amount due from the Administrator and the actual Refund Amount received from the Administrator.   SING agrees to provide written authorization to Seller to request from the Administrators a copy of the agreement between SING and Administrator.

8.   Term/Termination.   This Agreement shall commence as of the date shown above and shall continue until terminated in accordance with this Agreement. Either party may terminate this Agreement for any reason upon 30 days' written notice to the other party.   This Agreement may, at the option of SING and without liability to Dealer, be terminated immediately upon notice to Dealer.

9.   Warranties and Representations -- Dealer. Dealer   makes   the   following   covenants, representations, and warranties to SING as of the date of this Agreement. In addition, each time a Payment Plan Agreement is submitted to SING related to a Service Contract marketed or sold by Dealer, Dealer shall be deemed to have made each of the following covenants, representations, and warranties to SING.

(a)   Dealer is duly organized and existing in good standing under the laws of the state of its formation.

(b)   Dealer has the right, power, and capacity, and is duly authorized and empowered, to enter into, execute, deliver, and perform this Agreement.   This Agreement constitutes the legal, valid and binding obligation of Dealer and is enforceable in accordance with its terms.

(c)   The execution, delivery, and/or performance by Dealer of this Agreement shall not, by the lapse of time, the giving of notice, or otherwise, constitute a violation of any applicable law or a breach of any provision contained in Dealer's organizational, charter, or other governing documents or in any agreement, instrument, or document to which Dealer is now or hereafter may be a party, or by which Dealer is or may become bound.

(d)   Dealer is in compliance   with   all applicable federal, state, and local laws, rules, regulations, orders, and other directives of any kind (collectively, "Laws") and shall comply with all Laws as long as this Agreement is in effect. Without limiting the generality of the foregoing, Dealer and each of its officers and employees has received or made all qualifications, registrations, licenses, and similar authorizations that are required to be made or maintained under any Law in order for Dealer to engage in the business in which it is currently engaged, including the marketing and sale of Service Contracts.

(e)   All Payment Plan Agreements are genuine in all respects and are what they purport to be.   All Payment Plan Agreements represent undisputed bona fide transactions completed in accordance with the terms and conditions of the Payment Plan Program and all related documents (including this Agreement).   There are no set offs, counterclaims, or disputes existing or asserted with respect to any Payment Plan Agreement, and Dealer has not made any agreement with any Purchaser for any discount or deduction with respect to any Payment Plan Agreement.

(f)   No Payment Plan Agreement is subject to any prior assignment by Dealer or any claim, lien, or security interest held by Dealer or any other person, and Dealer will not make or grant any such

3

assignment, claim, lien, or security interest, nor permit any Payment Plan Agreement to become subject to any attachment, levy, garnishment, or other judicial process.

(g) Without limiting the generality of subsection (d) above, Dealer shall perform all activities associated with the solicitation, creation, maintenance, servicing, and cancellation of all Service Contracts and Payment Plan Agreements, and any and all related activities, in compliance with all Laws.   Dealer shall ensure that the Service Contract, Payment Plan Agreement, and any and all other agreements, forms, disclosures, instruments, notices, and other documents entered into with or provided to a Purchaser conform with all Laws and contain all notices, requirements, and other disclosures required by any Law.

(h)   Without limiting the generality of subsections (d) or (g) above, Dealer specifically agrees to be responsible for compliance with the federal Electronic Funds Transfer Act and Federal Reserve Regulation E (each as may be amended from time to time, and any and all successor Laws) and any similar state or local Laws (collectively, "EFT Laws") with respect to any payments made by a Purchaser to Administrator, Dealer, or SING pursuant to a Service Contract or Payment Plan Agreement by direct debit, ACH, or pre-authorized draft, regardless of the party (i.e., Administrator, Dealer, or SING) that would be primarily responsible for compliance under any such EFT Law. With respect to each such direct debit, ACH,   or pre-authorized draft, Dealer hereby represents and warrants to SING that the Purchaser has authorized such direct debit, ACH, or pre-authorized draft in accordance   with all EFT Laws.   Dealer shall promptly provide copies to SING of all records evidencing such authorizations. SING's failure to require Dealer to provide any such records shall not be deemed a waiver of Dealer's obligation pursuant to the preceding sentence.   To the extent that this subsection constitutes a delegation of duties required by any EFT Law by SING to Dealer, Dealer hereby accepts such delegation and agrees to be fully responsible for the performance of all such duties, as if it were primarily responsible under such EFT Law.

(i)   Dealer agrees and understands that the Purchasers are intended to receive interest-free extended payment terms.   The price offered to and paid (or agreed to be paid) by each Purchaser for any Service Contract (whether or not such Purchaser elected to participate in the Payment Plan Program) did not vary or depend in any way on whether or not such Purchaser participated in the Payment Plan Program or, alternatively, paid the purchase price for the Service Contract in another manner (e.g., in full at the time of sale). No discount under any circumstances may be or has been offered or made in any manner by reason of the Purchaser electing to not participate in the Payment Plan Program.

(j)   Dealer shall ensure that each Service Contract is and has been developed, marketed, sold, administered, and serviced in accordance with all applicable Laws and the terms of such Service Contract, including (without limitation) ensuring that each Purchaser receives any refund or credit to which such Purchaser may be entitled upon cancellation or termination of any Service Contract or Payment Plan Agreement.   Dealer acknowledges and agrees that, under no circumstances, shall SING have any obligation to make, pay, or otherwise provide any refund or credit to any Purchaser with respect to any Service Contract or Payment Plan Agreement.

(k)   With respect to each Service Contract marketed or sold by Dealer, Dealer is duly and properly authorized by the Administrator of such Service Contract to market and sell such Service Contract on behalf of the Administrator.

10.   Warranties and Representations – SING. SING   makes   the   following   covenants, representations, and warranties to Dealer as of the date of this Agreement.

(a)   SING is duly organized and existing in good standing under the laws of the state of its formation.

(b)   SING has the right, power, and capacity, and is duly authorized and empowered, to enter into, execute, deliver, and perform this Agreement.   This Agreement constitutes the legal, valid and binding

4

obligation of SING and is enforceable in accordance with its terms.

(c)     The execution, delivery, and/or performance by SING of this Agreement shall not, by the lapse of time, the giving of notice, or otherwise, constitute a violation of any applicable law or a breach of any provision contained in SING's organizational, charter, or other governing documents or in any agreement, instrument, or document to which SING is now or hereafter may be a party, or by which SING is or may become bound.

(d)     SING is in compliance with all applicable federal, state and local laws, rules, regulations, orders and other directives of any kind (collectively, "Laws") and shall comply with all Laws as long as this Agreement is in effect. Without limiting the generality of the foregoing, SING has received all qualifications, registrations, licenses and similar authorizations under the Law in order for SING to engage in the business in which it is currently engaged.

(e)     Without limiting the generality of subsection (d) above, SING specifically agrees to be responsible for compliance with the federal Electronic Funds Transfer Act and Federal Reserve Regulation E (each as may be amended from time to time, and any and all successor Laws) and any similar state or local Laws (collectively, "EFT Laws") with respect to any payments made by a Purchaser to Administrator, Dealer, or SING pursuant to a Service Contract or Payment Plan Agreement by direct debit, ACH, or pre-authorized draft, regardless of the party (i.e., Administrator, Dealer, or SING) that would be primarily responsible for compliance under any such EFT Law; provided however that nothing herein shall be excuse or otherwise relieve Dealer of its responsibility for obtaining proper Purchaser payment authorizations for any type of payment provided for under the Payment Plan Agreement.

11.     Indemnification and Reimbursement. Dealer agrees Dealer agrees to indemnify, defend, reimburse, and hold harmless SING, SING's affiliates, and their respective owners, directors, managers, officers, principals, employees, and agents from and against any and all losses, costs, obligations, liabilities, settlement payments, awards, judgments, fines, penalties, deficiencies, claims, or other charges or damages of any kind, absolute or contingent, matured or unmatured, liquidated or unliquidated, accrued or unaccrued, known or unknown, whether resulting from a claim made by a third party or whether directly incurred by the indemnified party, and any and all expenses incurred in connection with investigating, defending, or asserting any claim, action, suit or proceeding incident to any matter indemnified against hereunder (including court filing fees, court costs, arbitration fees or costs, witness fees, and reasonable fees and disbursements of legal counsel, investigators, consultants, accountants and other professionals) incurred or suffered by SING resulting from, in connection with, relating to, or arising out of either:

(a)     Any breach by Dealer of any of the covenants, representations, warranties, agreements, or other provisions of this Agreement, any Payment Plan Agreement, or any other agreement or instrument related to or contemplated by this Agreement; or

(b)     Any action, suit, proceeding, dispute, allegation, or claim of any kind by any third party (including, without limitation, any Purchaser and any governmental or regulatory agency) relating to the development, terms or conditions, marketing, sale, servicing, administration, or any other aspect of any Service Contract.

12.     Grant of Security Interest. To secure the prompt and complete payment and performance in full of all the obligations of Dealer to SING, now or hereafter owing, Dealer grants SING a security interest in all of the following: personal property of Dealer, wherever located and now owned or hereafter acquired (collectively, the "Collateral"):

(a)     Accounts

(b)     Chattel paper

(c)     Inventory

(d)     Equipment

5

(e)     Instruments, including promissory notes

(f)     Investment property, including securities accounts

(g)     Documents

(h)     Deposit accounts

(i)     Letter of credit rights

(j)     General intangibles, including payment intangibles

(k)     Supporting obligations

(l)     To the extent not listed above as original Collateral, proceeds and products of the foregoing:

Such Collateral includes assets of the Dealer, that are in the possession or control of Dealer or its Administrator(s), including, without limitation, any portion of the Dealer Profit and/or Dealer Cost that are being held by Administrator or under Administrator's control. Dealer shall execute and deliver, or cause to be executed and delivered, to SING such other documents, instruments, financing statements, continuation statements, partial releases, termination statements and such other documents as SING may deem necessary or appropriate to perfect SING's security interest in the Collateral pursuant to the Uniform Commercial Code as from time to time in effect in the State of New York. In the event SING, in its sole discretion, deems itself insecure, SING shall have the right to retain the Dealer Profit until such time as SING deems itself secure or any amounts due SING by Dealer have been paid in full.

13.   Amounts Due From Administrators and Producer Owned Reinsurance Companies. Dealer hereby acknowledges that Dealer or a producer owned reinsurance company (PORC) may be entitled to receive funds from an Administrator with respect to reinsurance earned premiums or retro earned premiums (the "Earned Premiums"). It is the intent of this provision that any Earned Premiums or other amounts that are due or may become due to Dealer or any of the persons or entities listed in the

following paragraph arising out of or pertaining to such PORC(s), shall be available to SING to apply to any refund or other obligation of Dealer to SING.

Dealer shall notify SING of any PORC's with respect to which Dealer, its principals (owners, members, shareholders, partners etc.) or any entity affiliated with Dealer by common ownership or otherwise, whether directly or indirectly, establishes a relationship with respect to which any PORC receives funds in any way related to or resulting from the funding provided by SING under this Agreement or in any way related to Dealer's sales of Service Contracts whether or not SING provides funding related to such Service Contracts. Dealer further authorizes and grants permission to SING to make periodic inquiry of Administrators with whom Dealer conducts business and submits payment plan agreements to SING related to Service Contracts offered and administered by such Administrators regarding the existence of any PORC(s) involving such Administrator and Dealer or any persons or entities mentioned in the preceding sentence. Dealer authorizes SING to disclose this Agreement to any such Administrator as evidence of the authorization granted by Dealer under the preceding sentence, as well as SING's right to receive amounts from Administrator pursuant to this section.

If at any time Dealer is in default of its obligations to SING under this Agreement, SING shall have the right, senior to all others, to receive any and all Earned Premiums or other amounts payable by such PORC to be applied to Dealer's obligations to SING.

In such event,

SING is hereby granted permission and the right to 1) instruct the Administrator to remit such Earned Premiums directly to SING upon SING's written instruction to Administrator; and the Administrator is hereby directed by Dealer to comply with such instruction; 2) instruct the Administrator to provide SING with any information, financial or otherwise SING seeks related to any such PORC or other interest Dealer may have related to Earned Premiums or the like. Dealer is hereby required to and agrees to deliver each Administrator's consent to this provision upon the creation or establishment of a PORC with such Administrator. Dealer further agrees to execute, or cause any third party with such

6

interest in any such PORC to execute any and all documentation requested by SING in order for SING to perfect, obtain or otherwise enforce its rights relative to the interest in the PORC, including, and not by way of limitation, to the extent permissible under applicable law, a pledge of the ownership interests in such PORC.

Dealer further agrees that SING may request prior written notice from an Administrator before PORC related funds can be released to Dealer.

### 14. Miscellaneous.

(a) Governing Law. This Agreement shall be construed in conformity with the laws of the State of New York, without regard to its choice of laws or conflict of laws rules. The parties irrevocably agree that all actions or proceedings in any way, manner, or respect, arising out of or from or related to this Agreement, shall be litigated only in courts located in New York County, New York. Each party consents and submits to the jurisdiction of any local, state, or federal court located within New York County, New York, and waives any right it may have to transfer the venue of any such litigation.

(b) Protection of Confidential Information. The parties shall execute a confidentiality agreement in form and manner acceptable to SING.

(c) Severability. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law; however, if any provision of this Agreement is held to be invalid under applicable law, such provision shall be enforced to the maximum extent possible, and the validity of the remaining provisions of this Agreement shall not be affected, shall remain in full force and effect, and shall be enforced to the maximum extent permitted by law.

(d) Assignment.   Dealer may not assign any of its rights nor delegate any of its duties under this Agreement without the prior written consent of SING, which may be withheld in SING's sole discretion. SING and its assignees may pledge its contract rights hereunder and any collateral documentation arising therefrom, including the assigning of Accounts, to any bank or other person that provides financing to SING in connection with the Payment Plan Program. SING may assign all or any portion of its interest in this Agreement to any third party(ies) without the consent of Dealer.

(e) Prevailing Party Costs.  The prevailing party in any litigation in connection with this Agreement shall be entitled to recover from the non-prevailing party all costs and expenses (including, without limitation, reasonable attorneys' and paralegals' fees and costs) incurred by such party in connection with any such litigation.

(f) Notices. Any notices or other communications required to be made pursuant to this Agreement shall be in writing and deemed to have been given and received (i) when personally delivered, (ii) on the day sent by facsimile machine, (iii) one day after being sent by a nationally recognized overnight courier with guaranteed next day delivery, or (iv) three days after being mailed by United States certified mail, return receipt requested, postage prepaid, to the party at its respective addresses as set forth below.

(g) Survival of Rights.  The provisions of Sections 9, 10, 11, 12 and 13 shall survive the termination of this Agreement indefinitely. In addition, the Dealer's obligations, covenants, representations, warranties, and other agreements of any kind with respect to any Service Contract or Payment Plan Agreement covered by this Agreement shall continue and survive until SING has been paid in full all amounts owing to SING.

(h) Rights of Creditors and Third Parties. The Agreement is entered into between Dealer and SING for the exclusive benefit of SING and its successors and assigns and is expressly not intended for the benefit of any other person or entity.   No third party shall have any rights as a result of this Agreement.

(i) Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which, when taken together, shall be deemed to be the same Agreement. Signatures transmitted by facsimile or email shall be considered authentic and binding.

(j)   Entire Agreement.   This Agreement, together with any policies, procedures, documents, notice, or other evidence of any kind related to SING's requirements, policies, and procedures for the Payment Plan Program or any aspect of the Payment Plan Program, contains the entire agreement between the parties regarding its subject matter and supersedes any previous and contemporaneous negotiations, representations, and agreements between the parties with respect to such subject matter, whether written or verbal.

(k)   Further Assurances.   Dealer shall execute and deliver such further instruments and do such further acts and things as may be reasonably required by SING to carry out the intent and purposes of this Agreement.

(l)   Waiver. No failure or delay by SING to exercise any of its rights, powers, or privileges pursuant to this Agreement shall operate as a waiver of such right, power, or privilege, nor shall any single or partial exercise of any such right, power, or privilege preclude any other or further exercise of that right, power, or privilege or any other    right,    power    or    privilege.

(m)   Title to Accounts.   Dealer acknowledges and agrees that title to all Payment Plan Agreements and all amounts owing by a Purchaser pursuant to any Payment Plan Agreement shall at all times be vested in SING and its assignees, and Dealer shall have no right, title, or interest in any Payment Plan Agreement or any such amounts.

(n)   Audit and Inspection Rights.   From time to time upon request by SING, Dealer shall provide to SING copies of Dealer's financial statements and such other internal records and documentation as SING may request in order to verify Dealer's compliance with this Agreement.

(o)   Binding Effect. This Agreement shall bind and inure to the benefit of the respective successors and permitted assigns of the parties to this Agreement.

SING and Dealer have executed this Dealer Agreement as of the date first set forth above.

SING For Service, LLC

By: _Clarence Townsend_

Its: VICE PRESIDENT

Name: CLARENCE TOWNSEND
Address: 205 N Michigan Ave,
              Suite 2200
              Chicago, IL 60601
Attn:     Clarence Townsend
Fax No.: 312-601-2205

Zander Collins, Smith,
DEALER: _National Car Cure_

By: _____

Its: _member_

Name: _Gui Kenny_
Address: _1601 Palm Beach Lake_
              _215_
              _WPB, FL 33401_
Attn: _____
Fax No.: _____

8

# EXHIBIT A

### (SING Discount Amount)

<u>Discount Amount</u>:

SING shall charge Dealer ("**Seller**") for each Service Contract with a Payment Plan Agreement a Discount Amount comprised of the total Discount Fees collected:

<u>Discount Fee:</u>

For each Service Contract with a Payment Plan, SING shall earn a monthly Discount Fee calculated based on the following:

    1. <u>Interest Charge:</u>       █████ (APR) on the outstanding ledger balance of the Dealer Cost ("**Seller Cost**") and Advanced Amount.

    2. <u>Payment Processing Fee:</u>    █ per payment processed

The estimated Discount Amount for each account shall be withheld from Seller Profit funding to Seller.

## Exhibit B
### (Dealer Funding)

<u>Advance Rate:</u>

SING shall fund to the Seller an Advanced Amount for each Service Contract with a Payment Plan Agreement on the Seller funding date based on the following:

1. Advance Rate:

Payment Plans from 02 – 12 Months:
Payment Plans from 13 – 18 Months:
Payment Plans from 19 – 24 Months:

2. Advanced Amount:

Advanced Amount shall mean, for each account, an amount equal to the product of (i) the Advance Rate multiplied by (ii) the difference between the Dealer Profit ("Seller Profit") minus the Down Payment minus the estimated Discount Amount.

# EXHIBIT B

<div style="border:1px solid black; text-align:center;">

## SING FOR SERVICE, LLC
## ADMINISTRATOR AGREEMENT

</div>

THIS ADMINISTRATOR AGREEMENT (together with its appendices, the "Agreement") is dated as of <u>October 23, 2017</u>, by and between <u>SING For Service, LLC</u>, a Delaware Limited Liability Company ("SING"), and <u>Matrix Financial Services, LLC</u>, a Delaware Limited Liability Company, with an address at 3100 McKinnon Street, Suite 420, Dallas, TX 75201 ("Administrator").

*Certain capitalized terms are defined in the attached <u>Appendix A</u>.*

### Background

SING is in the business of servicing payment plan programs for sellers and administrators of Service Contracts.

Administrator is in the business of administering Service Contracts sold by various third party Sellers (or, in some cases, by Administrator). Administrator would like the ability to allow Purchasers to pay for a Service Contract on a monthly basis, subject to Purchaser's right to cancel the Service Contract and related Payment Plan Agreement and receive a refund from Administrator of any unearned payments. To this end, Administrator will enter into Payment Plan Agreements with Purchasers, which will allow Purchasers to pay for Service Contracts on a monthly basis, subject to such cancellation rights (the "Payment Plan Program").

The parties are entering into this Agreement to agree on the terms and conditions upon which SING will support, finance and service Administrator's Payment Plan Program.

### Agreement

Therefore, for good and valuable consideration, the receipt and sufficiency of which is acknowledged, SING and Administrator agree as follows:

1.  <u>Term</u>.
The term of this Agreement shall commence on the date hereof and continue until terminated. Except for the RoFR and terms as specified in the Program Manager Agreement dated July 21, 2017, either party may terminate this Agreement upon 90 days' prior written notice to the other party for any other or no reason. In addition, SING may terminate this Agreement immediately upon an Event of Default by Administrator.

2.  <u>Service of Accounts</u>. Each Account shall be serviced in accordance with this Section. SING has the right to accept or reject any Account for any reason (or no reason) in SING's sole discretion.

(a) *Account Requirement.* Administrator covenants, represents, and warrants that it will cause each Account to meet all of the requirements set forth on the attached <u>Appendix B</u>, which may be modified from time to time by SING in the manner set forth in <u>Appendix B</u>.

(b) *Submission of Accounts to SING.* Within five (5) business days following a Purchaser's execution of a Payment Plan Agreement, Administrator shall provide, or shall cause Seller to provide, SING with a verification of such Purchaser's Account by providing SING with (i) the fully-completed Payment Plan Agreement, duly executed by Purchaser, or such other documentation as specified from SING (ii) the amounts of the Sale Price, Down Payment, and Seller Cost for such Account, and (iii) such other information as may be requested by SING. Administrator will ensure that all electronic data files and other information be delivered to SING in conformity with this Agreement, SING's standard seller agreement, and all other policies and procedures for the Payment Plan Program in effect from time to time. SING will rely on Administrator with respect to the amount of the Sales Price, the Seller Cost, the Seller Profit and the Down Payment. Any dispute between Administrator and the applicable Seller regarding the Sales Price, the Seller Cost, the Seller Profit or the Down Payment shall be resolved by Administrator and the applicable Seller. SING has no involvement in the contractual relationship, economic or otherwise, between Administrator and Seller, and Administrator shall hold harmless and indemnify SING as to any disputes, of any nature, between Administrator and

1

Seller. Administrator acknowledges that the Seller Cost for each Account is sufficient to cover: (i) all fees to Administrator for administrative services related to the Service Contract, (ii) all amounts used to fund any reserve required by the Insurer or otherwise in connection with the Service Contract, and (iii) all amounts required to obtain the coverage under the Insurer's policy with respect to the Service Contract ("Coverage").

(c)     *Funding to Administrator.* If SING chooses to accept an Account, SING shall pay the Seller Cost for such Account to Administrator in accordance with and pursuant to SING's policies and practices in effect from time to time. SING's acceptance of any Account shall not be deemed a waiver or modification of any of Administrator's obligations or responsibilities in this Agreement.

(d)     *Funding to Seller.* SING shall pay the Seller Profit to Seller in accordance with and pursuant to SING's policies and practices in effect from time to time. In the event that Administrator or SING ceases to accept new business from the Seller, the Seller Profit shall be paid to Seller only after all Seller's obligations to SING have been fully satisfied.

(e)     *Status of Amounts Paid to Administrator and Seller.* Administrator hereby acknowledges and agrees that (i) irrespective of whatever the Service Contract may provide regarding the term for which the Service Contract remains in effect, for purposes of this Agreement, the Sales Price shall be earned on a daily basis over the term of the Service Contract, (ii) accordingly, the Seller Cost and Seller Profit are earned by Administrator and Seller, respectively, on a daily basis over the term of the Service Contract, and (iii) the unearned portion of the Sales Price is the sole and exclusive property of SING. To the extent not owned by SING, Administrator grants to SING a security interest in the following (the "Collateral"): (i) any portion of the Seller Cost and Seller Profit in the possession of SING or Administrator, (ii) any and all assets of the Administrator that are in the possession of SING, and (iii) the Coverage and the proceeds thereof. Administrator shall execute, assign and deliver to SING such other documents, instruments, financing statements, continuation statements, partial releases, termination statements and such other documents as SING may deem necessary or appropriate to perfect SING's security interest in the Collateral pursuant to applicable law.

(f)     *SING's Right to Withhold.* Notwithstanding any provision in this Agreement to the contrary, in the event SING, in its sole discretion,

deems itself insecure, SING shall have the right to retain all or any amounts of Seller Cost and Seller Profit until such time as SING deems itself secure.

(g)     *Administration of Service Contracts.* Administrator shall solely and exclusively administer, service, and maintain the Service Contracts. Administrator's obligations under each Service Contract include, without limitation, the adjudication of claims, the payment of claims, the issuance of refunds to Purchaser upon cancellation of the Service Contract, and any other issues relating to the Service Contract itself. SING shall have no responsibility, liability, or obligations with respect to the administration, service, or maintenance of any Service Contract or any of Administrator's obligations under this Agreement. Without limiting the generality of the foregoing, Administrator shall be solely and wholly responsible for refunding to each Purchaser all amounts required to be refunded or paid to Purchaser upon any cancellation of the Payment Plan Agreement or related Service Contract. Administrator acknowledges and agrees that any such amount owed to Purchaser is separate and different from the Refund Amount for such Account owing to SING pursuant t  this Agreement, and Administrator agrees that a Refund Amount owing to SING shall not be reduced by any refund paid to Purchaser as contemplated in this subsection. SING shall have no obligation to refund amounts to any Purchaser, and Administrator shall not inform any Purchaser that SING is or may be obligated to refund such amounts. Administrator may delegate its duty to issue refunds to a Seller, but shall remain liable for any failure of a refund to be properly paid. Administrator shall cause to be paid or pay such refunds in full on a timely basis, in accordance with the terms of the Payment Plan Program, the Service Contract, and any applicable law.

3.   Cancellation.

(a)     *Cancellation by SING.* In the event of any default by Purchaser under a Payment Plan Agreement, SING shall have the right to immediately cancel the Payment Plan Agreement by sending written notice to the Purchaser, Seller and Administrator. Upon receipt of such notice, Administrator shall cancel the related Service Contract effective on the date set forth in the cancellation  otice and pay to SING the Refund Amount in accordance with this Agreement.

(b)     *Cancellation by Purchaser.* If Administrator or the Seller of a Service Contract receives notice from a Purchaser that such Purchaser is cancelling its Service Contract, then Administrator must (i) immediately notify SING in writing of such

2

Purchaser's cancellation, (ii) treat the Service Contract as cancelled effective as of the date Administrator or Seller received such notice, and (iii) pay to SING the Refund Amount in accordance with this Agreement.

(c)     *Cancellation Statements.* SING shall send Administrator weekly statements setting forth newly-cancelled Accounts, the Refund Amounts due to SING for such newly-cancelled Accounts, and the unpaid balances of any Refund Amounts from previous months. Administrator shall pay to SING the Refund Amounts (or portions of Refund Amounts) that SING may demand from Administrator from time to time. Administrator acknowledges that SING may bill the applicable Seller of each cancelled Account a portion of the Refund Amount owed for such Account. To the extent SING collects any portion of a Refund Amount from the Seller, Administrator's liability for the full Refund Amount for such Account shall be reduced accordingly. Notwithstanding any attempt by SING to collect any portion of a Refund Amount from Seller, Administrator shall remain liable for the full balance of each Refund Amount, payable upon demand by SING. If Administrator does not pay any amount owing pursuant to this Agreement within 30 days of the due date, interest shall accrue thereon at the rate of [   ] per annum from the due date until payment is made. Administrator shall have 30 days from its receipt of any periodic statement from SING to object to any part of such statement by sending a written objection notice to SING, which notice shall contain specific details of Administrator's objection. If Administrator fails to properly provide written notice of objection within such 30-day period, Administrator shall be deemed to have conclusively agreed with such statement in its entirety.

(d)     *Earned Reserve Premiums.* Administrator acknowledges that, from time to time, a Seller may be entitled to receive funds from an Insurer or Administrator with respect to reinsurance earned premiums or retro earned premiums according to an agreement or arrangement between the Seller (or a principal or other affiliate of Seller) and Administrator or an Insurer (the "Earned Premiums"). Administrator acknowledges and agrees that Administrator shall, upon receipt of written notice from SING, forward any such Earned Premiums to SING and cause Insurer to forward any such Earned Premiums to SING. Administrator will not distribute, and will prevent an Insurer from distributing, any Earned Premiums or other amounts to a Seller without SING's consent.

(e)     *Right of Offset.* SING has the right to apply any amounts held by SING to which the Seller or the Administrator has a right to any amounts due to SING from Administrator or Seller.

(f)     *Absolute Make-Whole Obligation.* Administrator expressly acknowledges and agrees that this Agreement obligates the Administrator to make best efforts to make SING whole with respect to the Seller's Refund Amount for each cancelled Account, regardless of any action or omission of any Seller.

4.     Representations, Warranties and Covenants

(a)     *Each party hereby covenants, represents and warrants that:*

(i)     Such party is, and at all times hereafter shall be, duly organized and existing and in good standing under the laws of the state of its formation, and is, and at all times hereafter shall be, qualified or licensed to do business in all states in which the laws thereof require such party to be so qualified and/or licensed

(ii)     Such party has the right, power and capacity, and is duly authorized and empowered, to enter into, execute, deliver and perform this Agreement. This Agreement constitutes the legal, valid and binding obligation of such party and is enforceable in accordance with its terms.

(iii)     The execution, delivery and/or performance by such party of this Agreement shall not, by the lapse of time, the giving of notice or otherwise, constitute a violation of any applicable law or a breach of any provision contained in its organizational, harter, governing documents or similar document or in any agreement, instrument or document to which such party is now or hereafter may be a party, or by which such party is or may become bound.

(iv)     Such party is not in violation of any applicable statute, regulation or ordinance of the United States of America, of any state, city, town, municipality, county or any other jurisdiction, or of any agency thereof, in any respect materially and adversely affecting its business, property, assets, operations or conditions, financial or otherwise, and such party shall maintain in force and effect, all material government and other licenses and authorizations necessary for the conduct of its business.

3

(b)    *Administrator hereby covenants, represents and warrants that.*

(i)    Administrator will furnish SING with evidence that all amounts due to the provider of the Coverage (the "Insurer") for all Accounts have been paid to Insurer and that the Coverage exists and applies to all Accounts.

(ii)    The Seller Cost and the Seller Profit are earned at a rate no greater than daily over the term of the Service Contract.

(iii)    Administrator shall cause all Sellers participating in the Payment Plan Program to execute and deliver to SING the standard seller agreement of SING.

(iv)    Administrator acknowledges and agrees that the Sales Price of the Service Contract to the Purchaser must be the same whether or not the Purchaser elects to purchase the Service Contract under the Payment Plan Program, and shall cause the Service Contracts to be sold on such basis.

(v)    Administrator has provided a true and correct copy of the Coverage to SING, and such Coverage is in full force and effect as of the date hereof. Administrator represents and warrants that SING has been named as an additional insured and loss payee under the Coverage.

(vi)    Administrator shall provide SING with such information respecting the business and financial condition of Administrator as SING shall deem reasonable or necessary from time to time.

(vii)    At SING's request, Administrator shall use its best efforts to get the Insurer to execute and deliver to SING an Unconditional Guaranty Agreement or other guaranty, satisfactory to SING, to fully guarantee the payment and performance of all obligations of Administrator pursuant to this Agreement.

(c)    *Legal Compliance.* Administrator agrees to be responsible for ensuring that all activities associated with the solicitation, creation, maintenance, servicing, and cancellation of all Accounts, and any and all related activities, are conducted in compliance with all applicable federal, state, and local laws, rules, regulations, orders, and other directives of any kind (collectively, "Laws"). Without limiting the generality of the preceding sentence, Administrator agrees to be responsible for (i) Seller's compliance with all Laws in connection

with any and all activities performed (or required to be performed) by Seller in connection with this Agreement, and (ii) ensuring that the Service Contract, Payment Plan Agreement, and any and all other agreements, forms, disclosures, instruments, notices, and other documents entered into with or provided to a Purchaser conform with all Laws and contain all n..tices, requirements, and other disclosures required by any Law (regardless of whether or not any such documents are provided by SING to Administrator or Seller).

(d)    *EFT Laws.* Without limiting the generality of subsection (c) above, Administrator specifically agrees to be responsible for compliance with the federal Electronic Funds Transfer Act and Federal Reserve Regulation E (each as may be amended from time to time and any and all successor Laws) and any similar state or local Laws (collectively, "EFT Laws") with respect to any payments made by a Purchaser to Administrator, Seller, or SING pursuant to a Service Contract or Payment Plan Agreement by direct debit, ACH, or pre-authorized draft, regardless of the party (i.e., Administrator, Seller, or SING) that would be primarily responsible for compliance under any such EFT Law. With respect to each such direct debit, ACH, or pre-authorized draft, Administrator hereby represents and warrants to SING that the Purchaser has authorized such direct debit, ACH, or pre-authorized draft in accordance with all EFT Laws. Administrator shall promptly provide copies to SING of all records evidencing such authorizations. SING's failure to require Administrator to provide any such records shall not be deemed a waiver of Administrator's obligation pursuant to the preceding sentence. To 'he extent that this subsection constitutes a delegation of duties required by any EFT Law by SING to Administrator, Administrator hereby accepts such delegation and agrees to be fully responsible for the performance of all such duties, as if it were primarily responsible under such EFT Law.

5.    Events of Default.  The occurrence of any one or more of the following events shall constitute an "Event of Default" hereunder.

(a)    Administrator shall fail to pay any amount due to SING within 10 days following the date when due.

(b)    The Coverage shall not apply to any Account or the Insurer shall change without SING's prior written consent.

(c)    Administrator shall fail to comply with any representation, warranty or covenant of this

4

Agreement, which failure remains uncured for 30 days following notice to Administrator.

(d) A petition under Title 11, United States Code or any similar law or regulation shall be filed by or against Administrator or Administrator shall make an assignment for the benefit of creditors.

6. <u>Remedies: Termination</u>. Upon the occurrence of any Event of Default, (a) SING shall have the right to hold all amounts due to Administrator and Sellers until all Accounts are paid in full (including collection by SING of all Refund Amounts); (b) SING shall have the right to terminate this Agreement on written notice thereof; (c) SING shall have the right to seek any other remedy, at law or in equity, to which it may be entitled; and (d) SING shall have a right of set-off against amounts due Administrator or Seller in an amount equal any amounts owed by Administrator or Seller to SING as a result of an Event of Default (the "Set-Off Amount"). SING shall not be obligated to pay future Seller Costs or Seller Profits until such time as the Set-Off Amount has been paid in full.

7. <u>Indemnity</u>

(a) **By Administrator**. Subject to the terms, conditions and limitations set forth in this Section 7, Administrator shall indemnify, defend and hold harmless SING, its affiliates, and their respective owners, directors, managers, officers, principals, employees and agents from and against any and all losses, costs, obligations, liabilities, settlement payments, awards, judgments, fines, penalties, damages, deficiencies, claims or other charges, absolute or contingent, matured or unmatured, liquidated or unliquidated, accrued or unaccrued, known or unknown and any and all expenses incurred in connection with investigating, defending or asserting any claim, action, suit or proceeding incident to any matter indemnified against hereunder (including court filing fees, court costs, arbitration fees or costs, witness fees, and reasonable fees and disbursements of legal counsel, investigators, consultants, accountants and other professionals) incurred or suffered by SING resulting from, in connection with, relating to or arising out of:

i. any breach by Administrator or Seller of any of their covenants or agreements, or any failure of Administrator or Seller to perform any of their obligations, in this Agreement, any agreement between SING and a Seller, any Service Contract, the Coverage, any other agreement between Administrator and SING, or any other agreement or instrument contemplated hereby;

ii. any breach of any warranty or the inaccuracy of any representation of Administrator or Seller contained or referred to in this Agreement, any agreement between SING and a Seller, any Service Contract, the Coverage, or any other agreement between Administrator and SING, or any other agreement or instrument contemplated hereby; and/or

iii. any action, suit or proceeding by a third party relating to any Account or the subject matter of this Agreement.

(b) **By SING**. Subject to the terms, conditions and limitations set forth in this Section 7, SING shall indemnify, defend and hold harmless Administrator, its affiliates, and their respective owners, directors, managers, officers, principals, employees and agents from and against any and all losses, costs, obligations, liabilities, settlement payments, awards, judgments, fines, penalties, damages, deficiencies, claims or other charges, absolute or contingent, matured or unmatured, liquidated or u liquidated, accrued or unaccrued, known or unknown and any and all expenses incurred in connection with investigating, defending or asserting any claim, action, suit or proceeding incident to any matter indemnified against hereunder (including court filing fees, court costs, arbitration fees or costs, witness fees, and reasonable fees and disbursements of legal counsel, investigators, consultants, accountants and other professionals) incurred or suffered by Administrator resulting from, in connection with, relating to or arising out of:

i. any breach by SING of any of their agreements, or any failure of SING to perform any of their obligations, in this Agreement, any agreement between SING and a Seller, any other agreement between Administrator and SING, or any other agreement or instrument contemplated hereby;

ii. any breach of or the inaccuracy of any representation of SING contained or referred to in this Agreement, any agreement between SING and a Seller, any other agreement between Administrator and SING, or any other agreement or instrument contemplated hereby; and/or

iii. any action, suit or proceeding by a third party relating to any Account or the subject matter of this Agreement

8. <u>Miscellaneous</u>.

(a) *Governing Law.* This Agreement shall be construed in conformity with the laws of the State of New York, without regard to its choice of laws or conflict of laws rules. The parties irrevocably agree that all actions or proceedings in any way, manner or respect, arising out of or from or related to

this Agreement, shall be litigated only in courts having situs within New York County, New York. Each party hereby consents and submits to the jurisdiction of any local, state or federal court located within New York County, New York, and waives any right it may have to transfer the venue of any such litigation.

(b) *Protection of Confidential Information.* The parties shall execute a confidentiality agreement in form and manner acceptable to SING.

(c) *Severability.* Any provision of this Agreement which is illegal, invalid, prohibited or unenforceable shall be ineffective to the extent of such illegality, invalidity, prohibition or unenforceability without invalidating or impairing the remaining provisions hereof.

(d) *Assignment:* Administrator may not assign its rights nor delegate any duties under this Agreement without the prior written consent of SING which shall not be unreasonably withheld for as long as there are installment payments remaining and refunds due on a cancelled Account, Administrator acknowledges that the Purchaser has expressly assigned the benefits under the designated Service Contract to SING. SING and its assignees may pledge its contract rights hereunder and any collateral documentation arising therefrom, including the assigning of Accounts, to any bank or other person that provides financing to SING in connection with the Payment Plan Program. SING may assign all or any portion of its interest in this Agreement and benefits under the designated Service Contract to any third party(ies) including to a grantor's trust or the secondary loan securitization markets without the consent of Administrator.

(e) *Prevailing Party Costs.* The prevailing party in any litigation in connection with this Agreement shall be entitled to recover from the non-prevailing party all costs and expenses, including, without limitation, reasonable attorneys' fees and costs, incurred by such party in connection with any such litigation.

(f) *Notices.* Any notices and other communications required hereunder shall be in writing and deemed to have been given and received (i) when personally delivered, (ii) on the day sent by facsimile machine, (iii) one day after being sent by a nationally recognized overnight courier with guaranteed next day delivery or (iv) three days after being mailed by United States certified mail, return

receipt requested, postage prepaid, to the parties at their respective addresses as set forth below. The foregoing shall not apply to cancellation statements, invoices, and similar communications sent from time to time by SING, which may be sent by email.

(g) *Survival of Rights.* Upon any termination of this Agreement, (i) the provisions of this Agreement shall survive and continue apply to all Accounts accepted by SING prior to the effective date of termination until either the full Payment Plan Amount or the f l Refund Amount for each Account outstanding at the time of termination has been collected by SING in full, and (ii) the provisions of Sections 4, 6, 7 and 8 shall survive indefinitely.

(h) *Rights of Creditors and Third Parties.* The Agreement is entered into between Administrator and SING for the exclusive benefit of Administrator and SING and their respective successors and permitted assigns and is expressly not intended for the benefit of any other party. Except and only to the extent provided by applicable law, no creditor or other third party shall have any rights under this Agreement.

(i) *Counterparts.* This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which, when taken together, shall be deemed to be the same Agreement. Signatures transmitted by facsimile shall be considered authentic and binding.

(j) *Further Assurances* Each of the parties shall h eafter execute and deliver such further instruments and do such further acts and things as may be required or useful to carry out the intent and purposes of this Agreement and as are not inconsistent with the terms hereof. All documents delivered electronically shall be binding on the parties.

(k) *Waiver.* No failure or delay by either party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

(l) *Title to Accounts.* The Administrator hereby acknowledges and agrees that title to all Accounts (including all Payment Plan Agreements relating thereto and all amounts owing by a Purchaser pursuant to any Payment Plan Agreement) shall at all times be vested in SING and

6

its assignees, and neither Administrator, Insurer, nor the Seller shall have any right, title or interest therein.

SING and Administrator have executed this Agreement as of the date first set forth above.

SING For Service, LLC

By: _____

Its: President

| | |
|---|---|
| Name: | Margaret Chan |
| Address: | 205 N Michigan Ave., |
| | Suite 2200 |
| | Chicago, IL 60601 |
| Attn: | Margaret Chan |
| Fax: | 312-601-2205 |

ADMINISTRATOR:

Matrix Financial Services, LLC

By: _____

Its: _____

| | |
|---|---|
| Name: | Joel San Antonio |
| Address: | 3100 McKinnon Street, Suite 420 |
| | Dallas, Texas 75201 |
| Attn: | Joel San Antonio |
| Fax No.: | _____ |

7

# APPENDIX A

## CERTAIN DEFINITIONS

"Account" shall mean the account of any Purchaser that has entered into a Payment Plan Agreement administered by SING for the purchase of a Service Contract administered by Administrator.

"Coverage" for a particular Service Contract shall mean the Insurer's duties provided under the contractual liability insurance policy between the Administrator and the Insurer.

"Discount Amount" for a particular Account shall mean the amount SING is entitled to receive for the services provided by SING pursuant to this Agreement, which amount shall be as agreed upon by SING and the Seller of the Service Contract for such Account and may vary from Seller to Seller or with respect to different types of Service Contracts or Payment Plan Agreements.

"Down Payment" for a particular Account shall mean the amount of cash paid by the Purchaser to the Seller at the time of the Purchaser's purchase of the Service Contract and, in any event, prior to the Purchaser's entry into a Payment Plan Agreement.

"Payment Plan Amount" for a particular Account shall mean an amount equal to the difference between the Sales Price and the Down Payment. The Payment Plan Amount shall also mean an amount equal to the sum of the Seller Cost, Seller Profit, and Discount Amount.

"Payment Plan Agreement" for a particular Account means the agreement between the Administrator or Seller and Purchaser to pay the Sales Price of a Service Contract (less the Down Payment) in installment payments, subject to Purchaser's cancellations rights set forth in the Service Contract and/or the Payment Plan Agreement.

"Purchaser" shall mean the individual or entity that purchases a Service Contract.

"Refund Amount" for a particular Account shall mean (i) the amount of the Seller Cost funded by SING, *plus* (ii) the amount of the Seller Profit funded by SING, *plus* (iii) the Discount Amount, *plus* (iv) all late fees and other fees and charges assessed pursuant to the provisions of the Payment Plan Agreement, *less* (v) any payments received by SING with respect to such Account.

"Sales Price" shall mean an amount equal to the price at which Purchaser purchases the Service Contract. This amount does not include any delinquent charges or other late payment charges which the Purchaser is otherwise required to pay pursuant to the Payment Plan Agreement.

"Seller" shall mean the person or entity who sells Service Contracts to Purchasers. The parties acknowledge that, with respect to some Accounts, the Administrator may sell the Service Contract and there is no third party Seller involved. With respect to those Accounts, all references to Seller in this Agreement shall be deemed to refer to Administrator.

"Seller Cost" shall mean the portion of the Payment Plan Amount (assuming the Payment Plan Amount is paid in full by the Purchaser) that Administrator is entitled to receive.

"Seller Profit" shall mean the portion of the Payment Plan Amount (assuming the Payment Plan Amount is paid in full by the Purchaser) that the Seller for such Account is entitled to receive.

"Service Contract" shall mean any motor vehicle or home warranty or service contract that provides for the repair or replacement of, or reimbursement for the repair or replacement of, either motor vehicles and their covered components or home appliances and systems, including, without limitation, mechanical breakdown insurance policies.

## APPENDIX B

## CERTAIN ACCOUNT REQUIREMENTS

In addition to any other requirements set forth in this Agreement, each Account must meet the requirements set forth below. Notwithstanding any provision to the contrary in this Agreement, any Payment Plan Agreement, or any other agreement or instrument, as between Administrator and SING, it shall be Administrator's responsibility and obligation to ensure that each Account meets all of these requirements, and Administrator covenants, represents, and warrants to SING that each Account will meet each of these requirements at all times:

1. The Seller must be a party to a written agreement with SING.

2. The Seller must inform the Purchaser of the terms of the Payment Plan Program only by means of forms and written communications supplied by, or reviewed and approved in advance by, SING, in its sole discretion.

3. The Seller must not make any written or verbal representation or warranty to the Purchaser that is inconsistent with the terms and conditions of the Payment Plan Agreement, this Agreement, or any other terms and conditions of the Payment Plan Program, as determined by SING in its sole discretion from time to time.

4. The Sales Price charged to the Purchaser is no higher than the Sales Price charged for the same Service Contract to a Purchaser who does not participate in the Payment Plan Program.

5. The Purchaser has duly executed and agreed to be legally bound by the Payment Plan Agreement.

6. The Seller collected from the Purchaser a Down Payment of at least ▮ of the Sales Price of the Service Contract at the time the Purchaser entered into the Payment Plan Agreement.

7. The Service Contract has a term of 24 months or greater and requires Administrator to pay the Purchaser a refund upon cancellation of the Service Contract calculated on a pro rata basis based on the number of days in the term of the Service Contract.

8. The Payment Plan Agreement has a term equal to not more than one-half the number of months in the term of the Service Contract, but in any case not more than 24 months.

9. The Payment Plan Agreement shall provide that Purchaser shall pay an amount equal to the Payment Plan Amount directly to SING by either (i) direct debit, ACH or pre-authorized draft against the Purchaser's checking account; (ii) direct monthly payments sent by the Purchaser to SING or (iii) pre-authorized charges to a credit or charge card of Purchaser acceptable to SING.

10. The Administrator shall be the obligor of the Service Contract.

11. The Purchaser shall have the right to cancel the Service Contract and Payment Plan Agreement at any time without further obligation.

Administrator agrees that SING may amend this Appendix B, without the consent of Administrator, by providing a new Appendix B at least 10 days prior to the effective date of such new Appendix B.

9

## Addendum to Administrator Agreement

This ADDENDUM TO ADMINISTRATOR AGREEMENT (the "Addendum"), signed as of the 9th day of May 2019 (the "Effective Date"), is entered into by and between SING For Service, LLC, a Delaware Limited Liability Company ("SING"), Matrix Financial Services, LLC, a Delaware Limited Liability Company ("Administrator") and Plateau Casualty Insurance Company ("Company").

### Background

A.      SING and Administrator are parties to an Administrator Agreement dated October 23, 2017 (the "Administrator Agreement") pursuant to which SING administers a payment plan program for Administrator. Capitalized terms used in this Addendum without being defined shall have the meanings assigned in the Administrator Agreement.

B.      Pursuant to the Administrator Agreement, SING funds a portion of the Sales Price for a Service Contract (the Dealer Profit, also known as Seller Profit) to the applicable Dealer (also known as Seller) and a portion of the Sales Price (the Dealer Cost, also known as Seller Cost) to the Administrator.

C.      Administrator has obtained Coverage for each Service Contract from Company.

D.      From time to time, SING withholds from funding to Dealer certain amounts ("Dealer Reserves") to help offset or pay for refunds due from Dealer for canceled Service Contracts and their related Payment Plan. The Dealer's refund obligations to SING for each canceled Service Contract is equal to the total amount funded to both the Dealer and Administrator plus the discount amount earned minus customer payments and minus any refund amount paid by the Administrator. Any remaining funds in the Dealer Reserves after the full repayment of all Dealer refund obligations to SING may, at SING's sole discretion, be released back to Dealer.

E.      The parties are entering into this Addendum to agree to the assignment of all Administrator rights and obligations in the Administrator Agreement to the Company in the event that the Administrator is no longer in business and/or bankrupt.

### Agreement

THEREFORE, for good and valuable consideration, the receipt of which is acknowledged by all parties, the parties agree as follows:

1. **Assignment.** Administrator shall assign and transfer to Company all    of Administrator's rights and obligations, including any refund obligations to SING, in the event that the Administrator is no longer in business and/or bankrupt.

2. **Ratification.** Except as expressly modified by this Addendum, the Administrator Agreement remains in full force and effect as written. This Addendum constitutes a part of and modification to the Administrator Agreement, and each reference to the Administrator Agreement (whether in the Administrator Agreement or in this Addendum) shall be deemed to refer to the Administrator Agreement, as modified and supplemented by this Addendum.

3. **Effectiveness:**     This Addendum shall be effective as of the Effective Date.

INTENDING TO BE LEGALLY BOUND, the parties execute this Addendum to Administrator Agreement as of the Effective Date.

SING:
SING For Service, LLC

By: Margaret Chan
Its: President

Administrator:
Matrix Financial Services, LLC

By: Joel San Antonio
Its: CMA

Plateau Casualty Insurance Company:

By: Dick Williams
Its: President